**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| WEST AMERICAN INSURANCE COMPANY, as subrogee of NANCY and DIRK MUMFORD, H/W | : : : : | **OPINION** |
| Plaintiffs, | : : | Civil Action No. 03-6161 (WHW) |
| v. | : : | |
| JERSEY CENTRAL POWER AND LIGHT COMPANY, a subsidiary of FIRSTENERGY CORPORATION | : : : | |
| Defendants. | | |

---

<u>**Walls, Senior District Judge**</u>

Defendant has filed a motion to bar the opinions of plaintiff's expert, Thomas M. Taylor, Ph.D.

### FACTS AND PROCEDURAL BACKGROUND

This case stems from a fire that occurred in the home of Nancy and Dirk Mumford on June 1, 2003. The Mumfords were insured by Plaintiff West American Insurance Company ("West American"). West American seeks to recover payments it made to the Mumfords. Defendant Jersey Central Power & Light Co. ("JCP&L") was the sole provider of electric services to the Mumford property and the surrounding area at the time of the fire.

The following sequence of events led to the fire: On or about June 1, 2003, JCP&L employee Kurt Semoneit was dispatched to respond to a "no lights" call on the Mumford's street, Calais Road in Randolph, NJ. Semoneit determined that the outage involved a transformer, located at pole number NJ115RA. He checked all secondary lines in the area for problems but

**NOT FOR PUBLICATION**

did not detect anything that would cause the transformer to trip. Upon arriving at pole number

NJ115RA, Semoneit inspected the secondary lines connected to the transformer and discovered

that they contained no voltage, indicating that the transformer had tripped – in other words,

ceased operating.  In order to restore power, Semoneit reset the transformer fuse. He also

rechecked the electric lines connected to the transformer and confirmed that they contained the

proper voltage, further indicating that the transformer had tripped. Semoneit then noticed a fire in

the front of the Mumford property. He got a fire extinguisher from his truck to extinguish the

fire, but saw that the fire was too large and called the dispatcher who called the fire department.

According to the findings of Raymond Stromburg, a Randolph Fire Official, "it appears

that the area of origin for the fire was in the wall in the area above the main electrical panel and

the rear of the electrical meter box."  The plaintiff alleges that the fire was the result of the

JCP&L's negligence and seeks damages totaling $315,494.03.  In support of its theory of

liability, the plaintiff served two expert reports prepared by Dr. Thomas M. Taylor – the first

prepared on September 9, 2005, the second on November 15, 2005. The defendant relies on the

October 25, 2005 expert report of Lawrence P. Sacco, P.E. which concluded that "the fire

resulted from a fault in the electric service entrance lines owned and under the control of" the

Mumfords.

The defendant previously filed a motion for summary judgment on two grounds: first, that

as a public utility, JCP&L was immune from subrogation suits based on a claim that JCP&L

failed to provide proper service, and second, that under the standards in the tariff that JCP&L

filed with the Board of Public Utilities, JCP&L could not be found liable for any damages given

NOT FOR PUBLICATION

the facts of the case. On January 23, 2007, the Court rejected both arguments and denied the

defendant's motion for summary judgment.

The defendant now moves to preclude the testimony of Dr. Taylor.

## DR. TAYLOR'S EXPERT REPORTS

*September 9, 2005 Report*

In his September 9, 2005 report (the "Sept. 9, 2005 Report"), Dr. Taylor described his

investigation, the materials and facts he considered and his inspection of the fire scene:

> My inspection of the scene showed that the bare, steel cable messenger neutral
> conductor of the triplex service cable to the Mumford house had arced apart a few
> feet from its point of attachment to the front left corner of the house. The two
> insulated conductors of the triplex service cable were intact. Close examination of
> the black plastic insulation on these two normally energized conductors showed it
> to have been marked locally by the arc that caused the steel conductor to melt and
> separate but the insulation was otherwise intact. For this reason, I am certain that
> the fire played no part in causing the steel conductor to melt apart.

(Sept. 9, 2005 Report at 2.) Dr. Taylor offered two possible ways in which a primary fault in the

transformer could have caused the fire.  According to Dr. Taylor:

> The most probable scenario is that for some reason the transformer serving the
> Mumford house tripped out on June 1, 2003 causing the outage. When Mr.
> Semoneit reset the circuit breaker in the transformer he caused a short to occur
> between a high-voltage primary line and one of the low-voltage service entrance
> conductors leading to the Mumford house. Insulation breakdown occurs as voltage
> is raised on low voltage cables. This the natural consequence of surpassing the
> voltage rating that the insulation was designed to withstand. When breakdown
> occurs at some point it acts as a surge suppressor and prevents breakdown from
> occurring at other points. The careless action of Semoneit caused 12,500 volts to
> be applied to service entrance cables to the Mumford house that were rated to
> withstand only 600 volts. This caused the cable to arc above the panel box and
> this led to the initiation of this fire.

(Id. at 4.)

NOT FOR PUBLICATION

A second "likely scenario," according to Taylor was that:

> "[T]he outage on the day of the fires was caused by a 12,500-volt primary line
> coming into contact with the outside of the case of the transformer. This would
> have been caused by an improperly routed feed line to the insulator on top of the
> transformer, from a high voltage phase wire on top of the pole drooping down and
> contacting the case. This would cause a massive ground current to flow through
> all grounded conductors attached to the pole. This ground current would burn out
> the most robust path to ground and then seek the next robust path. Eventually this
> would lead to very high current flowing to the Mumford house water pipe through
> the steel cable neutral of the triplex feeder and the aluminum ground cable. This
> would explain the arc melting of this steel cable a few feet from the corner of the
> Mumford house. This would have heated the aluminum cable where it passed by
> the service entrance cable, just above the panel box, and this heat would have
> compromised the insulation of this service entrance cable in that area. All of these
> events would have taken place in a few seconds or less. The transient imbalance
> of the three-phase electrical grid, brought about by the short circuit fault, would
> have caused the circuit breaker in the transformer to open, thus temporarily
> discontinuing any further electrical degradation inside the Mumford house. When
> Semoneit reset the circuit breaker inside the transformer this re-energized the lines
> in the Mumford house. Electrical degradation then resumed at the sight in the
> service entrance cable where the insulation had been compromised and this led to
> the initiation of the fire.

(Id. at 5.)

Dr. Taylor concluded the following:

> To summarize, this fire was electrical in origin. The cause was not found in the
> branch wiring of the house. It was determined that no circuit breaker tripped in
> this fire. This further rules out branch wiring as the cause of the fire. Furthermore,
> power to the house had been off for over two hours prior to the discovery of the
> fire and had only been on for minutes before the fire was discovered. The point of
> origin was below the level of the first floor, above the panel box in the basement
> in the service entrance cable running between the meter pan and the panel box.
> This explains why no circuit breaker tripped in the fire: power to the panel box
> was cut off in the earlier stage of the fire. The fire was triggered by an event
> linked to the service coming back on. It was a dramatic event that led to rapid
> initiation of burning that cuased [sic] the fire to burn through to the outside where
> it could be discovered a short time later. Records produced by JCP&L show that a
> primary fault was associated with the cause of this fire.

-4-

**NOT FOR PUBLICATION**

(<u>Id.</u> at 5-6.)

***November 15, 2005 Report***

On November 15, 2005, Dr. Taylor submitted a supplemental report (hereinafter, the "Nov. 15, 2005 Report"), adding to his earlier findings. He explained that the supplemental report was "being offered in light of the new evidence which became available to [him] at [his] November 2, 2005 inspection of the JCP&L equipment removed from the Mumford premises shortly after the fire," which he had not before had an opportunity to inspect. (Nov. 15, 2005 Report at 1.)

He went on to explain that his initial, and "only [other] inspection of the overhead service entrance cable was carried out on an extension ladder leaning against the Mumford house while the severed messenger conductor and two lines conductors were still stretched between the house and the pole near the street. [He] had to inspect these in mid air and could not see all the way around the insulation on the two line conductors." (<u>Id.</u>) According to Dr. Taylor, his second "close inspection revealed an arc sight on one of the two conductors at a location that corresponds to the location where the bare, grounded messenger conductor was severed by an electrical arc, approximately 43 inches from the splice installed by JCP&L at the time service to the Mumford house was installed." (<u>Id.</u>) He continues that "[t]his finding is significant because it provides a corresponding sight for the arc that severed the messenger conductor and it explained the cause of the fire at the Mumford residence." (<u>Id.</u>)

While in his "earlier report [he] offered two plausible explanations for how the fire could have started due to the actions of Mr. Semoneit," in the Nov. 15, 2005 Report Taylor deemed the

NOT FOR PUBLICATION

scenario of a momentary grounding of a high voltage line with the ground system at the pole

serving the Mumford house "a remote possibility." (Id. at 2.)

> The scenario hypothesizes momentary contact of a high voltage line with the
> service entrance cable going to the Mumford house, due to the careless action of
> Mr. Semoneit. That action could have been the root cause for the Mumford fire in
> that it could have initiated the short-circuit between the bare messenger conductor
> and the line conductors... However, the short-circuit could have been caused by
> wear alone. In either case, the malfunction of the JCP&L triplex service entrance
> cable that exhibited by the undetected wear resulted in compromised insulation on
> one of the lines conductors which explains why the arc occurred at that point.

(Id.)  At oral argument, Dr. Taylor indicated that he plans to testify as to his opinion as offered in

the Nov. 15, 2005 Report that the fire was caused "by the floating neutral condition that occurred

when the grounded messenger conductor arced apart from the triplex service cable."  (Hr'g Tr.

4:19-5:3, Sept. 9, 2008.)

Dr. Taylor in the Nov. 15, 2005 Report criticized the explanation, provided by

defendant's expert Lawrence Sacco of Affiliated Engineering Laboratories, that the electrical

event that severed the bare messenger conductor near the house was due to the heat of the fire as

"def[ying] reason and sound engineering principles for several reasons." (Nov. 15, 2005 Report

at 2.)  According to Dr. Taylor, "[h]eat and flames would disperse and not concentrate when

traveling the distance for approximately ten feet from the window to the cable."  (Id. at 3.)

Because "there is no sign that the plastic insulation on either side of the arc sight [sic] ..." melted

or heated, "there is no sign of heating on the insulation going radially around from the arc sight

[sic]" ... or "on the insulation of the other conductor [in the triplex]" and heating "occurred only

where the arc occurred," the heating could not be attributed to flames from ten feet away.  (Id.)

NOT FOR PUBLICATION

Dr. Taylor concludes that it is better "explained by localized compromised insulation of one line

conductor caused by wear." (Id.)

Dr. Taylor wrote that "[t]he short circuit that occurred in the triplex service entrance cable

to cause the Mumford fire resulted from the negligent practices on the part of JCP&L who owns

this equipment." (Id. at 3.) In support of this conclusion he quotes from Section 214 of the 1987

National Electric Safety Code ("NESC") which states:

2.    *Inspection* Lines and equipment shall be inspected at such intervals as
        experience has shown to be necessary.
3.    *Tests* When considered necessary, lines and equipment shall be subjected
        to practical tests to determine required maintenance.
5.    *Remedying of Defects* Lines and equipment with recorded defects which
        could reasonably be expected to endanger life of property shall be
        promptly repaired, disconnected, or isolated.

(Id.)

Dr. Taylor opines further that "[h]ad the Mumford service entrances lines owned and

installed by JCP&L been inspected and tested the defect that caused this fire would have been

discovered and remedied and this fire could not have occurred." (Id.)

Finally, in conclusion, Dr. Taylor writes:

[T]he fire at the Mumford house was caused by an open-neutral condition at the
house. This was caused by a short circuit between the bare grounded conductor
and one of the line conductors that caused the ground to sever. This short circuit
was caused by malfunction of the JCP&L triplex service entrance cable to the
Mumford house exhibited by wear of the bare conductor into the insulation of the
line conductor. This compromised insulation in the line conductor led to the short
circuit either directly or indirectly by making it the weak point in the insulation of
the triplex cable where a break down occurred when lineman Semoneit touched a
high voltage line to the triplex at the pole.

(Id.)

-7-   7

NOT FOR PUBLICATION

**LEGAL STANDARD**

**A.      "Net Opinion" Rule**

Under New Jersey law, an "expert's bare conclusions, unsupported by factual

evidence" are an inadmissible "net opinion." Buckelew v. Grossbard, 87 N.J. 512, 524

(1981). As the New Jersey Appellate Division explained:

> Under New Jersey law, an expert's opinion must be based on a proper factual
> foundation. In other words, 'expert testimony should not be received if it appears
> the witness is not in possession of such facts as will enable him [or her] to express
> a reasonably accurate conclusion as distinguished from a mere guess or
> conjecture. 'This prohibition against speculative expert opinion has been labeled
> by modern courts as the 'net opinion rule.' Under this doctrine, expert testimony
> is excluded if it is based merely on unfounded speculation and unquantified
> possibilities.

Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309, 323 (App. Div. 1996) (internal

citations omitted).

"The rule frequently focuses on the failure of the expert to explain a causal connection

between the act complained of and the injury allegedly resulting therefrom." May v. Atlantic City

Hilton, 128 F. Supp. 2d 195, 198 (D.N.J. 2000).  Yet, "[a]n expert's opinion need not be

grounded in direct evidence.... Circumstantial evidence, defined as 'a preponderance of

probabilities according to the common experience of mankind,' may also serve as the basis for

conclusions as to causation." Id. at 198-99 (citations omitted).

However, "the 'net opinion' rule is neither an evidentiary rule under the Federal Rules of

Evidence nor a factor in the Daubert analysis." Holman Enter. v. Fidelity & Guar. Ins. Co., 563

F. Supp. 2d 467, 472 n.12 (D.N.J. 2008). "[T]he net opinion rule is merely a restatement of the

well-settled principle that an expert's bare conclusions are not admissible under Rule 702 of the

NOT FOR PUBLICATION

Federal Rules of Evidence." Zeller v. J.C. Penney Co., 05-cv-2546 (RBK), 2008 WL 906350, at

*7 n.13 (D.N.J. Mar. 31, 2008); see also, Holman, 563 F. Supp. 2d at 472 n.12.  Some courts in

this District incorporate "net opinion" rule objections to an expert's opinion as part of the

Daubert analysis. See e.g., Zeller (holding it proper to posit the "net opinion" arguments under

the "fit" requirement); see also Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp.

2d 584, 611-12 (D.N.J. 2002) (considering "net opinion" arguments under the "reliability"

analysis).  Whereas other courts in this District consider the "net opinion" arguments separately

but focus on whether the opinion will be of "assistance to the trier of fact," May v. Atlantic City

Hilton, 128 F. Supp. 2d at 198-99; Curtis v. Besam Grp., 05-cv-2807 (DMC), 2008 WL 1732956

at *6 (D.N.J. Apr. 10, 2008), the same analysis required under the "fit" prong of Daubert.

**B.     Rule 702**

Rule 702 of the Federal Rules of Evidence governs the standards applicable for admission

of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Fed R. Evid. 702.

The Third Circuit has explained that the rule "embodies a trilogy of restrictions on expert

testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.

3d 396, 404 (3d Cir. 2003).  As the Supreme Court in Daubert noted: "[e]xpert evidence can be

both powerful and quite misleading because of the difficulty in evaluating it." Daubert v. Merrell

**NOT FOR PUBLICATION**

Dow Pharm., 509 U.S. 579, 595 (1993) (internal citations omitted).  The role of the Court is to

act as a "gatekeeper" assuring that opinion testimony that could be misleading because it does

not meet these three requirements does not reach the jury.  See id. at 592-93.  Daubert applies not

only to scientific knowledge, but also to testimony based on technical and other specialized

knowledge. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

  Defendant does not dispute that Dr. Taylor has the proper qualifications to be considered

an expert in this field.  With regard to "reliability," the Third Circuit has published a number of

specific factors that a district court should consider in determining whether expert testimony is

sufficiently reliable:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has
> been subject to peer review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's operation; (5)
> whether the method is generally accepted; (6) the relationship of the technique to
> methods which have been established to be reliable; (7) the qualifications of the
> expert witness testifying based on the methodology; and (8) the non-judicial uses
> to which the method has been put.

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994).  The test "is not whether a

particular ... opinion has the best foundation or whether it is demonstrably correct. Rather, the

test is whether the particular opinion is based on valid reasoning and reliable methodology."

Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3d Cir. 2000) (internal citations omitted).

However, "conclusions and methodology are not entirely distinct from one another" and a court

"must examine the expert's conclusions in order to determine whether they could reliably flow

from the facts known to the expert and the methodology used." Id. at 146. "[N]othing in either

Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence

which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that

there is simply too great an analytical gap between the data and the opinion proffered."  General

NOT FOR PUBLICATION

Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also In re Paoli, 35 F.3d at 746 ("When a judge

disagrees with the conclusions of an expert, it will generally be because he or she thinks that

there is a mistake at some step in the investigative or reasoning process of that expert.").

The third requirement, "fit", is a question of whether "the expert's testimony [is] relevant

for the purposes of the case and [will] assist the trier of fact." Schneider, 320 F.3d at 404.  As the

Supreme Court cautioned in Daubert, "'Fit' is not always obvious, and scientific validity for one

purpose is not necessarily scientific validity for other, unrelated purposes." Daubert, 509 U.S. at

591.  The standard for "fit" is "not that high" but it is "higher than bare relevance." In re Paoli,

35 F.3d at 745. It "requires that expert opinions ... apply principles or methods to the facts of the

case and produce conclusions that have a debatable connection to the question in issue." United

States v. Ford, 481 F.3d 215, 220 n.6 (3d Cir. 2007).

The burden is on the party advancing the expert to show that the reliability indicia of

Daubert are met.  However, "[t]his does not mean that plaintiffs have to prove their case twice –

they do not have to demonstrate to the judge by a preponderance of the evidence that the

assessments of their experts are *correct*, they only have to demonstrate by a preponderance of

evidence that their opinions are reliable." In re Paoli, 35 F.3d at 744.

**DISCUSSION**

This Court adopts the approach of the courts in this district which consider the "net

opinion" principles as part of the Daubert analysis.  If Dr. Taylor's opinions are not based on a

"factual basis or a reasonable degree of engineering certainty," as defendant contends, then the

methodology he employed was either unreliable or did not fit the facts of the case, and would

need to be struck under the Daubert analysis. If defendant's "net opinion" challenge constitutes

NOT FOR PUBLICATION

anything more than a Daubert challenge, it is a challenge solely to Dr. Taylor's conclusions and would be more properly made through cross examination and presentation of contrary evidence.

The defendant's challenge is limited to a cursory argument that "Dr. Taylor's report demonstrates that his opinions are derived from non-scientific methodology, and thus under the above standard [the Daubert standard], his opinions must be excluded." (Defs' Mem. at 14.) Relying on the "net opinion" cases, the defendant argues that Dr. Taylor has not shown that his opinions "are based on any specific fact or data or are the product of reliable principle and methods. [And] from reading his report alone, it is clear that his opinions are bare conclusions not based on sound science. His conclusions contain no objective, independent validation of his methodology and are not logically and scientifically applicable to the issues in dispute." (Id. at 14-15.)

Several of the Paoli factors do not provide guidance to the court. Dr. Taylor's opinion is not testable, his methods are not subject to peer review, there is no quantifiable potential rate of error and the non-judicial uses of Dr. Taylor's approach do not shed light on the admissibility of Dr. Taylor's opinion. That there is no contention that Dr. Taylor lacks sufficient qualifications cuts in favor of admitting his testimony but it is not dispositive. The primary inquiry of the Court then must be into Dr. Taylor's methodology, whether it was generally accepted, controlled by sufficient standards and related to methods that have been established as reliable. See In re Paoli, 35 F.3d at 742 n.8.

Dr. Taylor's methodology was to visually inspect the scene of the fire from a ladder and later, when it was available, closely inspect the triplex service cable after it had been removed

NOT FOR PUBLICATION

from the site.[1]  Dr. Taylor's conclusions are based entirely on this physical inspection and his

expertise and experience.  (Hr'g Tr. 22:2-22:23.)  Dr. Taylor acknowledged that he had firsthand

knowledge of two other occasions where abrasion occurred in a similar fashion to his proffered

opinion.  (Hr'g Tr. 37:18-39:2.)  Although Dr. Taylor claimed that he had secondhand knowledge

of other occurrences, he was unable to offer any sources for such occurrences.  (Hr'g Tr. 39:3-

39:7.)

　　　An expert's opinion "must be based on the methods and procedures of science rather than

on subjective belief or unsupported speculation." Oddi, 234 F.3d at 158.  While Dr. Taylor's

---

[1] In the Sept. 9, 2005 Report, Dr. Taylor explains that his investigation entailed the following:
I inspected and photographed the fire scene on June 4, 2003 and July 2, 2003. I spoke
with Mr. Mumford and Fire Official Raymond Stromburg of Randolph. I disconnected,
photographed, boxes and stored physical evidence from the fire scene and I continue to
store this evidence. I read and studied the June 2, 2003 report of Fire Official Stormberg.
I studied the Randolph Township Police Department Investigation Report prepared by
Christopher Giuloiani. I measured distances between the Mumford house and the
intermediate pole and utility pole NJ115RA that held a 25KVA transformer that served
the Mumford residence and three of their neighbors. I studied Defendant's answers to
interrogatories and associated discovery material including single line diagrams of the
JCP&L network near the Mumford home, trouble reports of JCP&L for the primary line
that fed the transformer that serviced the Mumford residence and utility lineman training
manuals. I spoke with Robert Radecke on several occasions regarding his investigation
into origin and cause of the fire. I read the depositions of Kurt Semoneit, a JCP&L
employee who was working at the transformer in front of the Mumford house at the time
this fire was discovered and the deposition of Christopher Carson, another employee of
JCP&L. I studied photographs taken by Fire Official Stromberg and Robert Radecke.

In his Nov. 15, 2005 Report, Dr. Taylor adds that:

This [supplemental report] is offered in light of new evidence that became available to
me at my November 2, 2005 inspection of the JCP&L equipment removed from the
Mumford premises shortly after the fire. I was not able to be there at time it was removed
and have not had the opportunity to inspect this equipment closely before November 2,
2005. My only inspection of the overhead service entrance cable was carried out on an
extension ladder leaning against the Mumford house while the severed messenger
conductor and two line conductors were still stretched between the house and the pole
near the street. I had to inspect these in mid air and could not see all the way around the
insulation on the two line conductors.

**NOT FOR PUBLICATION**

report does not contain any citation to scholarship or trade literature supporting his methodologies, plaintiff has submitted scholarly articles that demonstrate that Dr. Taylor is not opining about entirely novel theories. These articles support Dr. Taylor's conclusion, that "an arcing event on the hot leg of an incoming electric service conductor [that] severs the neutral conductor (floating neutral)," (Pl's Opp. at 7), can be the cause of a fire.  However, they fail to provide direct support for the methodology that Dr. Taylor used in coming to this conclusion.

At oral argument, the Court inquired as to whether Dr. Taylor's methods were accepted in the scientific community.  Dr. Taylor responded that his peers would use the same methods but could not produce support for this assertion short of reference to his experience.  (Hr'g Tr. 22:2-22:23.)  "[T]here may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it." Oddi, 234 F.3d at 158.  Cases where courts have allowed testimony based on the experience of the expert often involve testimony as to custom and practice that has been acquired via such experience.  Id. (citing Lauria v. National Railroad Passenger Corp., 145 F.3d 593, 599 n.7 (3d Cir. 1998) (former rail foreman could properly testify as to standard of care of railroad track equipment)).  Just as a court could be satisfied that a railroad foreman acquired sufficient experience to justify testimony as to railroad custom and practice, the Court is satisfied that Dr. Taylor's experience in fire investigation sufficiently supports his methodology absent evidence to the contrary.  While the burden is on plaintiff to demonstrate that Dr. Taylor's methods are reliable, defendant's briefing is devoid of any alternative methodology and fails to provide the court with any reason to doubt Dr. Taylor's assertion that visual inspection is the accepted method of determining the cause of a fire under the circumstances.

NOT FOR PUBLICATION

The Court is mindful that an opinion must be more than mere speculation.  Oddi, 234 F.3d at 158.  Contrasted with the opinions in the Sept. 9, 2005 Report, Dr. Taylor's opinion in the Nov. 15, 2005 Report was not speculative.  The Sept. 9, 2005 Report sets out a series of mere possibilities.  (See Sept. 9, 2005 Report at 4-5.)   In contrast, the Nov. 15, 2005 Report concludes that the *probable* cause of the fire was an arcing event, rejecting the other *possibilities* as implausible.  (Nov. 15, 2005 Report at 1; Hr'g Tr. 4:19-5:3, Sept. 9, 2008.)  Importantly, Dr. Taylor asserts that he holds his opinions "to within a reasonable degree of engineering certainty." (Nov. 15, 2005 Report at 3.)  Dr. Taylor's criticisms of the opinion of defendant's expert and his accompanying reasoning further buttress his opinion.  Dr. Taylor, based on his visual inspection, reasoned that the pattern of melting was inconsistent with the opinion of defendant's expert because flames would have dispersed over the distance from the house.  (Id. at 2-3.)  This opinion will be helpful to the jury because it will assist the jury in understanding the evidence of melting on the cable.  See Fed R. Evid. 702.  Defendant remains free to challenge Dr. Taylor's opinion before the jury by submitting its own expert opinion as well as evidence which diminishes the weight the jury the will afford Dr. Taylor's opinion.

This is not to say that the entirety of the Nov. 15, 2005 Report can be properly introduced. Defendant's arguments with regard to Dr. Taylor's conclusion that JCP&L was negligent focus on the fact that it was not required under NESC standards to inspect the power lines connected to the Mumford's home.  Curiously, defendants fail to argue that Dr. Taylor makes legal conclusions in his report by concluding that JCP&L's actions do not comport with the NESC standards and were thus negligent.  It is inappropriate for an expert to render a legal opinion. See Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). "Although Federal Rule

**NOT FOR PUBLICATION**

of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion. Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury." Id. (quoting United States v. Leo, 941 F.2d 181, 195-196 n.23 (3d Cir. 1991). ). While it may be appropriate for an expert to give testimony as to "custom and practice" in an industry, it is improper for an expert to "give his opinions as to legal duties that arose under the law." Leo, 941 F.2d at 196.  Here, although Dr. Taylor may permissibly testify as to industry standards as well as his opinion that the fire could have been prevented by an inspection, his conclusion that "the Mumford fire resulted from the negligent practices on the part of JCP&L," (Nov. 15, 2005 Report at 3), is an improper legal opinion which Dr. Taylor will not be allowed to present at trial.

**CONCLUSION**

For the preceding reasons, defendant's motion is denied in part and granted in part.  Dr. Taylor may present his opinion as stated in his Nov. 15, 2005 Report.  Dr. Taylor may not present his opinions from the Sept. 9, 2005 Report and may not introduce his conclusion that JCP&L was negligent.

**s/William H. Walls**
United States Senior District Judge

**NOT FOR PUBLICATION**

**Appearances**

William E. Gericke
Cozen and O'Connor
Libertyview Building
457 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002-2200

     Attorney for Plaintiff

Thomas C. Hart
Ruprecht, Hart & Weeks, LLP
306 Main Street
Millburn, NJ 07041
     Attorney for Defendant